Filed 1/27/22  P. v. Moses CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID DESHAWN MOSES,<br><br>    Defendant and Appellant. | F082061<br><br>(Super. Ct. No. BF131808A)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the State Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Poochigian, Acting P. J., Peña, J. and Snauffer, J.

## STATEMENT OF APPEALABILITY

This appeal is from an order denying appellant David DeShawn Moses's motion to reduce his sentence that finally disposes of all issues between the parties and is authorized by Penal Code section 1237, subdivision (b).[1]

## STATEMENT OF THE CASE

As stated by this court in our opinion in Moses's first appeal (consolidated case numbers F066160 & F066278), "A jury found defendants Katila Ann Jean Nash and David Deshawn Moses guilty of first degree murder (Pen. Code, [fn. omitted] §§ 187, subd. (a), 189) and found true the special circumstance that the murder was committed while defendants were engaged in the commission or attempted commission of burglary (§ 190.2, subd. (a)(17)(G)).  At the time of the offense, Nash was 15 years old and Moses was 17 years old, and they were tried as adults.  Nash was sentenced to 25 years to life in prison, and Moses was sentenced to life in prison without the possibility of parole (LWOP)."  The murder occurred on April 14, 2010.

In its fourth opinion in this matter, filed on May 2, 2018, this court remanded Moses's case to the juvenile court with directions to conduct a transfer hearing pursuant to Welfare and Institutions Code section 707, with a further order that if, at the transfer hearing the juvenile court determines it would have transferred Moses to a court of criminal jurisdiction, the judgment should be reinstated and the court should resentence him in light of *People v. Gutierrez* (2014) 58 Cal.4th 1354, pursuant to which the court could exercise its discretion to resentence Moses to a term of 25 years to life in prison in lieu of the previous LWOP sentence.

Adult criminal proceedings were reinstated on November 6, 2019.

The People filed a statement in aggravation on June 25, 2020 and Moses filed a points and authorities for youthful offender sentencing on October 19, 2020, attached to

---

[1] All statutory references are to the Penal Code unless otherwise stated.

which were psychological reports by Dr. Gary A. Longwith and Dr. McCoy Dean Haddock. Dr. Longwith's report concluded, "Given the history of this case, and his long-standing mental illness that predated the commitment offense, it is my opinion alternative sentencing may be appropriate. Although [Moses] may lack some emotional maturity at this point, his neurological development is likely established. He is less of a risk of violence today than he was at age 17-years-old." Dr. Haddock's evaluation, contrarily, concluded "It is my professional Clinical Opinion that Mr. David Moses remains 'At Risk' of further Violent Behavior and Sexual Violence at this time from his history, CDC&R history and recent history in the Kern County Jail."

The court conducted a resentencing hearing on October 21, 2020. The People introduced Exhibits 1 and 2, incident reports concerning Moses while in Kern County Jail awaiting resentencing on June 29, 2020 and September 12, 2019. After hearing arguments and statements from the victim's family, the court reinstated Moses's LWOP sentence and awarded him presentence credit for 3,840 actual days in custody.

On November 16, 2020, Moses filed a timely notice of appeal.

## STATEMENT OF FACTS[2]

On the afternoon of April 14, 2010, Andrew Masengale visited his grandmother Dorothy Session, at her house on Camino Sierra, located in the greater Bakersfield area.[3] Session was not feeling well, and she told Masengale she was going to take some Tylenol and lie down for a while until she had to pick up her son John at work. Around 3:15 p.m., Masengale left the house, locking the back door as he left. He always used the back door at Session's house, as did everyone who knew her. Session usually left the

---

[2] The Statement of Facts is quoted verbatim, without quotation marks, from this court's opinion in Moses's first appeal.

[3] All further dates in this section occurred in 2010.

back door unlocked when she was home so she could tend to her garden, but she would lock the back door if she were going to lie down. The front door was always locked.

Neighbors of Session reported seeing a man and two women in the area that afternoon. Patricia Sandoval lived on a cul-de-sac off Camino Sierra. Sometime between 2:00 and 4:00 p.m., she noticed her dogs were barking, and she went to the front door. She saw a male at her door and two females standing at the front of her driveway. Sandoval opened the door and asked if she could help them. One of the women asked if Matthew was there. Sandoval told them no one by that name lived there, and the three walked away. Later that night, Sandoval reported this incident to law enforcement. She described the man as Black, about six feet tall, wearing a red shirt, black gym shorts, and about 19 or 20 years old. The woman who spoke to Sandoval was short, a little wide and her hair was colored and worn in braids. The other woman was taller and wider than the woman Sandoval talked to.

Janet York lived two doors down from Session on Camino Sierra. Around 4:00 p.m., her dog started barking, and York noticed a young woman standing at the end of her front porch and looking over her fence. York thought the woman was Hispanic but agreed she could have been light-skinned Black. The woman asked if Erika was there. York also saw a young man and woman standing at the front of her driveway by the street. The man appeared to be Black and about 19 or 20 years old; the woman appeared to be Hispanic or light-skinned Black and about the same age. York told the woman on her porch that no one named Erika lived there, and the woman left.

Kimbria Lopez's parents were Session's next door neighbors on Camino Sierra. That day, Lopez took her mother shopping, and the two of them returned to Lopez's parents' house around 3:45 to 4:00 p.m. At that time, Lopez saw Session on her front porch; Session retrieved her mail, walked back inside her house, and closed the front door. Lopez's son Jacob, who was 14 years old, did not go shopping with his mother and grandmother, and instead stayed at Lopez's parents' house all afternoon with his

4.

grandfather. At some point, Jacob went to the bathroom, which had a window looking out on Session's driveway and house. Through the bathroom window, he saw a woman walking in the middle of Session's driveway. She wore an orange shirt and jeans. At trial, he identified Angelique [Nash] as possibly the woman he had seen near Session's house.

Around 6:00 p.m., Masengale received a call from his mother asking him to check on Session because she had not picked up his Uncle John from work. Masengale and his friend Megan Winder drove to Session's house. They entered through the back door, which was closed but unlocked. There were no signs of forced entry. Masengale noticed a buzzer for the oven was on, and he turned it off. He stepped on Session's glasses, which were on the floor. Then he noticed some blood on a chair and he walked around and found Session lying on the floor in the dining room. There was dried blood all over her face and she was throwing up blood. She was still conscious.

Winder called 911, and Masengale spoke to the dispatcher. Winder went outside where she saw a California Highway Patrol (CHP) officer and flagged him down. Masengale starting talking to Session. He asked her if she fell, and she said no. She said a Black man and Black woman were in the house and they wanted money. She asked Masengale to check for her purse. He found her purse in a dresser drawer in her bedroom. It appeared the bedroom had not been touched and nothing had been taken from her purse. Nothing appeared to be out of place in the house.

Richard Pierce was the CHP officer Winder flagged down. He arrived at Session's house at 6:35 p.m. Pierce knelt down beside Session and tried to make sure her airway was open. He asked Session "who had done this," and eventually Session said it was a young Black man. Pierce asked "how many had done this," and she responded two. He asked her to describe the second man, and Session stated it was a female. She did not identify the woman's race or ethnicity.

5.

Kern County Sheriff's deputy Joe Weiss responded to Session's house based on a dispatch report of a victim beaten in her home. In the house, he observed Pierce giving Session first aid. Weiss asked Session "who did this" and she said a Black male and a Black female. Within a few minutes, additional law enforcement officers and ambulance and fire department personnel arrived.

Session was 81 years old. She was taken to Kern Medical Center by ambulance and died later that night.

Criminalist Jeanne Spencer arrived at Session's house shortly after 10:00 p.m. to investigate the crime scene. She observed blood spatter and blood stains in the den and kitchen. In the den, there were blood stains on the floor in front of the fireplace, in front of a chair next to the fireplace, and near another chair that was next to the entry to the dining room. Blood was also spattered on the fireplace. A right shoe was found in the den near the entry to the kitchen. A tooth and what appeared to be dental hardware were lying on the floor near the fireplace. A left shoe and a tooth were found in another area of the den near the entry to the dining room. There were more blood stains in the dining room. In the kitchen, there was blood spatter on the side of the stove and at the threshold to the den. A Wave brand cigarette butt was found in the kitchen near the back door and collected as evidence.[4]

Based on the pattern of blood spatter, Spencer concluded there had been at least two events in the house: one event in the kitchen area by the entry to the den and another event in the den near the fireplace. Spencer characterized most of the blood spatter in these areas as "impact spatter," meaning the spatter was likely caused by a forceful event

---

[4] At trial, there was testimony that Session did not allow smoking in or near her house. In addition, a criminalist was able to find a mixture of DNA on the filter end of the cigarette butt, and she testified that she could not exclude any of the three defendants as contributors to the DNA on the cigarette.

such as a punch to the victim. She also observed linear marks on the floor suggesting the victim had been dragged a short distance in the den near the entry to the kitchen.

Forensic pathologist Lesley Wallis-Butler conducted an autopsy of Session the next day. Wallis-Butler observed "quite a bit of facial trauma." Session had a fractured nose, significant bruising over both eyes, and an abrasion on the center of her nose with a laceration that extended down the right side of her nose. She had a laceration that tore through the outer and inner part of the upper aspect of her lip and another laceration to the inner aspect of her upper lip. Session appeared to have been struck with such force that it tore the tissues under her lip and nose. She also had a laceration to her lower lip and a contusion to her lower lip. Session had a small contusion on her chest and bruises on the backs of her hands, her forearms, and her right elbow. In the internal examination, Wallis-Butler saw injuries consistent with falling and striking the back of the head. She concluded the cause of Session's death was blunt force head trauma. Based on the facial injuries, Wallis-Butler believed Session had been struck at least twice.

Jason Balasis, a detective in the robbery-homicide unit of the Kern County Sheriff's Office, was the lead investigator for the case. He received his assignment around 8:00 p.m. on April 14, and he went to Session's house that night. He interviewed Kimbria and Jacob Lopez, York, John Session, and Masengale.

The next day, law enforcement received information about the crime from Cecilia Martinez. Martinez lived in a converted garage behind a main house on Center Street (the Center Street house). Her adult neighbors at the Center Street house were Sonja Arnold and Roxy Dukes. According to Martinez, "quite a few kids" (teenagers and young adults) also stayed at the Center Street house. Arnold's niece, Nefertiti Patterson, and Patterson's child lived there. Arnold's nephew, Darontrell Gage, and Jesse Estrada lived there. Patterson and Gage were half siblings. Moses was Patterson's first cousin, and Moses had been staying at the Center Street house for about six weeks. In addition, Patterson and Angelique had known each other for 10 years and were best friends, and

7.

Angelique would visit the Center Street house. On April 15, Martinez received information about what happened to Session from Estrada and a niece of Arnold's named Tiarny. Based on what Estrada and Tiarny told her, Martinez called a secret witness hotline.

As a result of the secret witness tip, Balasis interviewed Martinez. After speaking with Martinez, Balasis interviewed Patterson, Gage, Arnold, and Estrada, all residents of the Center Street house.

Patterson told Balasis she spoke to the three defendants on the afternoon of April 14 before 5:00 p.m. The majority of her conversation was with Angelique. Angelique told Patterson that she was going to rob the old lady until the lady started screaming. Angelique said she left the house because the old lady started screaming. Patterson reported that, during her conversation with Angelique, [Katila] Nash was crying and Moses was shaking his head and repeatedly saying, "I'm sorry, cuz."

Patterson stated that Moses said he thought the lady was still alive but he was not sure. Moses told Patterson he heard the lady making noises. Angelique told Patterson that Moses had knocked the old lady over. Angelique said that she left, but went back for Nash because she could not leave her sister, that she was going to take something from the victim's home, but she did not because the lady scared her by screaming. Nash said she did not take anything from the house. Patterson told Balasis that Angelique was wearing an orange shirt. She also reported that Moses and Nash smoked cigarettes and she was not sure if Angelique smoked. Patterson did not think any of the defendants had been drinking or smoking when she talked to them.[5]

---

[5] At trial, Balasis testified about what Patterson told him as described. Patterson was also called as witness. She testified she remembered talking to Balasis and generally did not dispute she made the statements as Balasis testified. However, Patterson denied or claimed not to remember the underlying facts. For example, Patterson testified she could not remember whether Angelique told her what Moses had done, even though she agreed she told the police what he had done. In a similar vein, Patterson denied she saw

8.

Balasis also interviewed Gage. One of the first things Gage told Balasis was that he did not want to go to court and he did not want to be involved. Gage said he had contact with the three defendants on April 14. He indicated that he received most of his information from Moses. Gage stated that Moses told him he entered a lady's home and hit her. Moses said the lady yelled. Gage reported that Moses seemed scared and uneasy and Nash was crying.[6]

On April 17, Balasis assisted in the arrest of Nash and Angelique at a hotel. An orange shirt was found among their clothes. Balasis interviewed Nash and Angelique the day they were arrested. Moses turned himself in later that day, and Balasis interviewed him the next morning.

Balasis interviewed Angelique first. She told him they were looking for Matthew's house to smoke weed. They knocked on doors looking for Matthew. Angelique stated they went to three houses. At the first house, a lady told them Matthew did not live there. Angelique said a Mexican lady answered the door at the house she went to prior to the victim's house.

Angelique told Balasis that no one answered the front door at the victim's house. Angelique stayed outside and stood by a truck. She stated she walked to the back part of the victim's house and then went back to the front of the house. She heard someone screaming, "Oh, Lord, help me," but she did not see the victim. She was wearing an orange shirt. Angelique told Balasis that, after the incident, she went to the Center Street house and told Patterson what happened. Balasis told Angelique that Patterson had told

Nash crying, and she could not remember whether Moses said, "I'm sorry cuz," but she agreed she told the police these things.

[6] Gage's statements to Balasis were introduced at trial through Balasis's testimony. Gage was also called as witness, but he testified generally that he did not recall what Moses told him or what he (Gage) said during his interview with Balasis. For example, he testified that he did not remember whether Moses told him that the old lady yelled and he also did not remember his conversation with the police.

9.

him Angelique said she was looking for a house to steal from, but Angelique denied saying this to Patterson.

Next, Balasis spoke to Nash. She told him she was supposed to be living at a group home but she was staying with her mother in Bakersfield on Niles Street. She said they walked down the street knocking on doors and asking for Matthew. She admitted that she went inside the victim's home.

Nash remembered speaking to a lady with a dog. She talked to a Mexican woman who told her Matthew did not live there. At one point during the interview, Nash told Balasis that the victim answered the back door and Nash asked if she could use the telephone. Nash said she did not take anything from the home. She told Balasis that she saw the victim and began to cry. She also said she was scared and she should have called the police.

Balasis asked Nash whether she approached a house and asked for Erika, and she remembered doing so. Initially, Nash denied she went to the victim's house to break in. Balasis, however, told her he believed she went to steal things, and Nash admitted this was true. Nash said she intended to make sure no one was at home before she went to the back of the victim's house and the victim surprised her. She stated that, inside the house, she picked up the phone to call her sister, Sherina, to come get her. Nash told Balasis that the victim was making noises and asking for help.

Balasis interviewed Moses the next day. Moses told him that he had run away from a group home and he was originally from Bakersfield. He was staying at the Center Street house. He stated he smoked marijuana on April 14 and he was looking for someone named Matthew. Moses told Balasis he was high on KJ[7] and did not remember

---

[7] Balasis explained that KJ refers to phencyclidine (PCP) and is often mixed with marijuana and smoked.

what happened that day, although he did remember going to houses near the victim's house and knocking on doors and asking for Erika.

Moses also told Balasis that he smoked a blunt[8] and after the high faded, he went to the Center Street house to meet up with Patterson. He said he heard details of the crime and saw his photograph on the television news on April 17 and 18, and he was scared and did not know what to do.

Moses told Balasis that he probably told Gage what he had done because he was scared. Moses told Gage he hit the lady two times.

Balasis noticed Moses' right hand looked different from his left hand. A knuckle on his right hand was very swollen. There was redness and it appeared to have fresh scabbing.

Later in the interview, Moses admitted that he wanted to break into a house to get money for food. He said he went to the victim's home and asked to use the phone. He was wearing gloves. Moses stated that he was not planning on killing anyone. He thought the victim had a portable emergency pager that would call 911, and he did not know if she pressed the button. The victim went to the back door. Moses asked to use her telephone to get a ride. He said the victim let him in the house but then she looked like she was scared of him. At that point, Moses thought she may have pushed a button on a device to call the police.

Moses told Balasis he struck the victim twice. The first time she was standing and the second time she was on the ground. She was saying, "oh, God," and calling for help. He stated he dragged her from the kitchen into the living room area because he did not know if anyone else was in the house. Moses thought the victim was still alive because she was making noises when he left the house. He told Balasis he was at the victim's

---

[8] A blunt typically refers to a marijuana cigarette with a cigar wrapper. Moses told Balasis he walked down Niles Street and bought the blunt from some Mexicans.

house to get money to get something to eat.  He said he asked to use the phone because the victim surprised him.  Moses denied he had a weapon.  He said he burned the shoes he wore that day because he was scared and he did not want to get caught.

Call records for Session's telephone number showed a call from her phone was made to a cell phone number for Moses' uncle, Mike Patterson, at 4:17 p.m. on April 14. The call lasted nine seconds.

**Defense**

[¶] … [¶]

Psychologist Thomas Middleton evaluated Moses.  Moses' IQ of 84 fell in the borderline range.  Moses was placed in a group home when he was 13, and he was treated for ADHD.  Middleton diagnosed Moses with ADHD, combined type, impulse control disorder, not otherwise specified (NOS), depressive disorder, NOS, polysubstance abuse in institutional remission, physical abuse or neglect of child as victim, sexual abuse of child as perpetrator, borderline intellectual functioning, and personality disorder, NOS, with antisocial and borderline traits and paranoid and dependent features.  Middleton was presented the hypothetical that "an individual enters a residence and at the time or while inside of the residence the individual strikes another because that individual panicked and thought someone was [going to] push a button—a Life Alert type of a button."  He gave his opinion that this hypothetical behavior was entirely consistent with Moses' diagnoses. Assuming the hypothetical individual had taken PCP, the conditions could "result in extreme impulsivity and angry, unplanned, aggressive behavior."

## APPELLATE COURT REVIEW

Moses's appointed appellate counsel has filed an opening brief that summarizes the pertinent facts, raises no issues, and requests this court to review the record independently.  (*People v. Wende* (1979) 25 Cal.3d 436.)  The opening brief also includes the declaration of appellate counsel indicating Moses was advised he could file his own brief with this court.  By letter on April 20, 2021, we invited Moses to submit additional

12.

briefing.  On June 17, 2021, Moses responded to our invitation with a three-page letter which this court has read and considered.

Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to Moses.

## DISPOSITION

The trial court's October 21, 2020, order denying Moses's motion to reduce his sentence is affirmed.